Slip Op. 19-155

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GUIZHOU TYRE CO., LTD.; GUIZHOU TYRE IMPORT & EXPORT CO., LTD., <br><br> Plaintiffs, <br><br> and <br><br> TIANJIN UNITED TIRE & RUBBER INTERNATIONAL CO., LTD.; WEIHAI ZHONGWEI RUBBER CO., LTD.; <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Richard W. Goldberg, Senior Judge <br> Consolidated Court No. 18-00100 |

**OPINION AND ORDER**

[The court remands to Commerce for a further analysis of the Export Buyer's Credit Program. All other determinations made by the Department are sustained.]

Dated: December 10, 2019

*Matthew P. McCullough*, *Tung Nguyen*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd., and Guizhou Tyre Import & Export Co., Ltd.

*John Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel on the brief was *Orga Cadet*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Goldberg, Senior Judge:  Now before the court are the Final Results of Redetermination Pursuant to Court Remand, ECF 46-1 (Aug. 27, 2019) ("Remand Results"), of the Department of Commerce ("the Department" or "Commerce") in the countervailing duty ("CVD") investigation of off-the-road tires from the People's Republic of China ("PRC") during the period of review between January 1, 2015 and December 31, 2015.  *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 83 Fed. Reg. 16,055 (Dep't Commerce Apr. 13, 2018) (final results), *amended by Certain New Pneumatic Off-the-Road Tires from the People's Republic of China,* 83 Fed. Reg. 32,078 (Dep't Commerce July 11, 2018) (am. final results) ("*Amended Final Results*") and accompanying Issues & Decision Mem. ("I&D Mem.").  Following the court's remand back to Commerce, *Guizhou Tyre Co. v. United States*, 43 CIT __, 389 F. Supp. 3d 1315 (2019) ("*Guizhou II*"), the Department reviewed its determination on the Export Buyer's Credit Program ("EBCP" or "the Program") and provided additional support for its findings on distortion in the synthetic rubber market in 2015.  *See generally* Remand Results.  Specifically, the Department affirmed its findings regarding the EBCP and doubled down on its decision to apply an adverse inference that Plaintiffs used and benefited from the Program.  *Id*. at 3−14.  Additionally, the Department further explained its finding that the synthetic market was not distorted in 2015.  *Id*. at 14−16.  This additional explanation demonstrated that the composition of the synthetic rubber market in China changed significantly between 2014 and 2015.  *Id*. at 15.  Plaintiffs Guizhou Tyre Co. and Guizhou Tyre Import and Export Co., (collectively "Guizhou" or "Plaintiffs") oppose Commerce's Remand Results in its entirety.  *See* Pls.' Comments on the Department of Commerce's Remand Redetermination, ECF No. 48 (Sept. 26, 2019) ("Pls.' Comments").

The Department has provided adequate support for its finding distortion in the synthetic rubber market. The evidence provided by Commerce indicates that market conditions in 2015 were not "nearly identical" to those in 2014, as Plaintiffs claim. For example, pursuant to Commerce's explanation, the synthetic rubber market underwent a significant increase in import penetration. Therefore, the court sustains Commerce's remand results as to the distortion analysis. However, the court is not satisfied with Commerce's remand results relating to the EBCP. Once again, substantial evidence does not support the requisite threshold finding that there is a gap in the record warranting the use of adverse facts available ("AFA"). The court remands this issue back to Commerce for reconsideration in accordance with this opinion.

## DISCUSSION

The court exercises jurisdiction under 28 U.S.C. § 1581(c). The court must hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Further, "[t]he results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" *SolarWorld Ams., Inc. v. United States*, 41 CIT __, __, 229 F. Supp. 3d 1362, 1365 (2017) (quoting *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT __, __, 968 F.Supp.2d 1255, 1259 (2014)).

The Department has failed to "compl[y] with the court's remand order," *id.*, as it relates to Commerce's application of the AFA statute to the EBCP. Therefore, the court remands that portion of the Department's determination back to Commerce for reconsideration consistent with this opinion. As for the Department's market distortion analysis, the court upholds Commerce's redetermination as now supported by substantial evidence on the record, in light of the reasoned explanation now available to the court.

### I.      Synthetic Rubber Market Distortion Analysis

The Department determined that the 2015 synthetic rubber market was not distorted during the period of review because state-owned producers accounted for 23.97 percent of market consumption for synthetic rubber.  Remand Results at 14.  Therefore, Commerce used Tier 1 benchmarks for imports to measure the adequacy of remuneration for this input.  Plaintiffs challenged this determination, arguing that the results were inconsistent with the Department's distortion findings in 2014 because similar market conditions existed in the two years.  The court agreed, noting that the evidence in the record demonstrated that the synthetic rubber market between 2014 and 2015 was distinguished by only a few percentage points.  *Guizhou II*, 43 CIT at __, 389 F. Supp. 3d at 1324.  And so, the court concluded, the Department would be hard-pressed to justify a change in its distortion analysis, especially where it failed to provide much additional insight into its ultimate determination.  *Id*.  *See also Hussey Copper. v. United States*, 17 CIT 993, 997, 834 F. Supp. 413, 418 (1993) ("It is 'a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure . . . . This rule is not designed to restrict an agency's consideration of the facts from one case to the next, but rather it is to insure [sic] consistency in an agency's administration of a statute.'") (citing *Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988)).

On remand, the court ordered Commerce to "specifically explain how the market for synthetic rubber in the PRC changed between 2014 and 2015 and what aspects of those changes caused Commerce to find that the market was not distorted in 2015."  *Guizhou II*, 43 CIT at __, 389 F. Supp. 3d at 1325.  The Remand Results show that Commerce did just that.  Commerce further explained how the "composition of the synthetic market in China showed significant

change between 2014 and 2015," Remand Results at 15. The "significant change" is largely

based on the dramatic increase in imports from 2014 to 2015 (a 33.36 percent jump).

Plaintiffs claim that the Remand Results do little to move the needle, because

"Commerce is simply leveraging the law of small numbers to reach its 'significant' and

'substantial' findings, where very small absolute changes in small numbers may yield higher

percentage changes, but objectively the changes are still incredibly small." Pls.' Br. 8.

However, this contention seems to be based on Plaintiffs' fundamental misunderstanding of

Commerce's data points and how percentages work. First, the data provided by the Department

indicates that although total domestic consumption and the Government of China's ("GOC")

production of synthetic rubber fluctuated only slightly between 2014 and 2015, the (substantial)

33.36 percent increase in import penetration strongly suggests lower overall government

involvement. As Commerce explains, a decrease in government production (8.7 percent

decrease from 2014 to 2015) and a decrease in the GOC's production as a share of total

consumption of the product (a 3.65 percent decrease)—*coupled with* the 33.36 percent increase

in import penetration—supports the conclusion that the Chinese synthetic rubber market was not

distorted by government involvement. And, the Department also noted in its Remand Results

that there is no evidence on the record that the GOC had administered any policies that would

have a "distorting effect on the market by maintaining an artificially high level of domestic

supply, leading to artificially lower prices." Remand Results at 16.

Second, Plaintiffs claim that Commerce stills "fails to explain why a higher import

penetration number . . . and a lower GOC market share . . . should necessarily alter its conclusion

from 2014 that the market was distorted." Pls.' Br. 8. But unlike in its initial determination,

Commerce now *does* explain how a higher import penetration number affects (at least, the

perception of) government involvement. *See* Remand Results at 27 ("[T]he significantly higher level of imports in 2015 and the correspondingly lower level of the GOC share of consumption indicate a significant loss of government dominance in the market."). Additionally, Guizhou's concern that "Commerce is leveraging the law of small numbers" to manipulate its distortion findings, Pls.' Br. 8, is unsupported by the record. Indeed, the evidence as presented by Commerce's Remand Results demonstrates that the market circumstances did *not* remain unchanged from 2014. While some of the changes reflected minor percentage shifts, others yielded significant variations from 2014 to 2015—especially on data points that relate to distortion indicators. The fact that *Guizhou* considers the changes insignificant does not raise concerns with "the law of small numbers," *id*. The composition of the synthetic rubber market in China showed significant change due to an increase in imports, and this is a sufficient explanation for Commerce's distortion findings in 2015. The court now sustains the Department's findings on market distortion in the Chinese synthetic rubber market.

## II.      Export Buyer's Credit Program

For purposes of this opinion, familiarity with the facts on this issue is generally presumed. *See Guizhou II*, 43 CIT at __, 389 F. Supp. 3d at 1267–69. In this administrative review, Commerce examined whether Plaintiffs benefited from the EBCP, a loan program instituted by the GOC that provides loans to foreign companies to promote the export of Chinese goods. *See Clearon Corp v. United States*, 43 CIT __, 359 F. Supp. 3d 1344, 1347 (2019) (discussing the EBCP). Previously, in response to Commerce's questions regarding the Program's operation, both the GOC and the Plaintiffs responded that because "none of Guizhou's customers used the Program," the respondents could not provide any further information about the Program's operations. *Guizhou II*, 43 CIT at __, 389 F. Supp. 3d at 1320.

In support thereof, Guizhou submitted declarations from its U.S. customers confirming non-use. *Id*. at 1321.

As in nearly every recent administrative review of this Program, Commerce has requested information surrounding two 2013 revisions to the EBCP that now purportedly "limit[ed] the provision of Export Buyer's Credits to business contracts exceeding USD [two] million," and "use[d] third-party banks to disburse/settle Export Buyer's Credits." I&D Mem. at 14. The GOC has repeatedly refused to provide information about the 2013 revisions, stating that the revisions were "internal to the bank, non-public, and not available for release." Remand Results at 9. Based on this non-cooperation, the Department determined that the GOC both withheld requested information and significantly impeded the administrative proceeding. I&D Mem. at 14−15. According to Commerce, "[t]he GOC has not provided the requested information and documentation necessary for Commerce to develop a complete understanding of this program," and therefore, the Department could not verify Guizhou's submitted non-use declarations from its U.S. customers. *Id.* at 14. Through the application of AFA, Commerce found that the Plaintiffs had used and benefited from the Program, despite non-use declarations demonstrating the contrary. *Id*. at 14−15.

The court disagreed with Commerce on its first pass, and now Commerce's remand results fare no better. Below, the court found that "the Department's decision to apply AFA as to the EBCP based on an alleged lack of cooperation was unlawful because Commerce demonstrated no gap in the record, the respondents submitted evidence of non-use of the Program, and the Department's findings of unverifiability of necessary information was unsupported by record evidence." *Guizhou II*, 43 CIT at __, 389 F. Supp. 3d at 1329. Therefore, on the first remand, the court ordered Commerce to "reconsider its adverse inference that the

[EBCP] was used by Guizhou's customers and reach a new determination on this issue based on findings supported by substantial record evidence[.]" *Id.*

Commerce continues to find that there is a gap in the record because the Department cannot verify the submitted non-use declarations without additional information surrounding the 2013 revisions to the EBCP. Remand Results at 9−11. One of the revisions involved routing EBCP loans through (undisclosed) third-party banks, and not through the Export-Import Bank of China ("EX-IM Bank") as Commerce originally thought. *Id.* at 9. As in the previous administrative review, the Department reiterated that "[t]he GOC once again refused to provide the sample application documents or any regulations or manuals governing the approval process [for the Program]." *Id.* at 4. Without this information, Commerce concluded that it could "not verify non-use of export buyer's credits" "in a manner consistent with its verification methods, which are primarily the methods of an auditor, attempting to confirm usage or claimed non-usage by examining books and records which can be reconciled to audited financial statements, or other documents." *Id.* at 5−6. Commerce asserts that the "completeness" principle is "an essential element of Commerce's verification methodology," *id.* at 6, and without the allegedly "missing" information, the Department's verification "would amount to looking for a needle in a haystack with the added uncertainty that Commerce might not even be able to identify the needle when it was found." *Id.* at 14. Therefore, Commerce continues to impute usage of the EBCP based on the application of adverse facts available.

The Department's (flawed) reasoning has remained unwavering—despite now *eleven* decisions from this Court urging Commerce to correct the repeated blatant deficiencies in its AFA analyses of the EBCP. *See, e.g.*, *Changzhou Trina Solar Energy Co. et al. v. United States*, Slip Op. 19-143, 2019 WL 6124908 (CIT Nov. 18, 2019) ("*Changzhou V*"); *Changzhou Trina*

*Solar Energy Co. et al. v. United States*, Slip Op. 19-137, 2019 WL 5856438 (CIT Nov. 8, 2019)

("*Changzhou IV*"); *Jiangsu Zhongji Lamination Materials Co. v. United States*, Slip Op. 19-122,

2019 WL 4467099 (CIT Sept. 18, 2019); *Guizhou Tyre Co. et al. v. United States*, Slip Op. 19-

114, 2019 WL 3948913 (CIT Aug. 21, 2019) ("*Guizhou III*"); *Guizhou II*, 43 CIT __, 389 F.

Supp. 3d 1315; *Clearon Corp.*, 43 CIT __, 359 F. Supp. 3d 1344; *Changzhou Trina Solar*

*Energy Co. v. United States*, Slip Op. 18-167, 2018 WL 6271653 (CIT Nov. 30, 2018)

("*Changzhou III*"); *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, 352 F. Supp.

3d 1316 (2018) ("*Changzhou II*"); *Guizhou Tyre Co. v. United States*, 42 CIT __, 348 F. Supp.

3d 1261 (2018) ("*Guizhou I*"); *Changzhou Trina Solar Energy Co. v. United States*, 41 CIT __,

255 F. Supp. 3d 1312 (2017) ("*Changzhou I*"); *SolarWorld Ams., Inc. v. United States*, 41 CIT

__, 229 F. Supp. 3d 1362 (2017).  In response to Commerce's dereliction, then, the Court's

opinion today will also remain unwavering.  The Department is ordered on remand to pursue

verification of the non-use affidavits on record from Plaintiffs; otherwise, as it stands, the

Department's use of adverse facts available to impute use of the EBCP is unlawful on the record

of this case.

    An adverse inference cannot be applied unless it is first appropriate to use facts otherwise

available.  *See* 19 U.S.C. § 1677e(b).  And then, only if an interested party also "fail[s] to

cooperate by not acting to the best of its ability to comply with a request for information" can

Commerce use an adverse inference when choosing from those facts available.  *Id*.

§ 1677e(b)(1).  Otherwise, "[a]bsent a valid decision to use facts otherwise available" *and* a

finding that a respondent failed to "act[] to the best of its ability," "Commerce may not use an

adverse inference."  *Shandong Huarong Machinery Co. v. United States*, 30 CIT 1269, 1282,

1301−02, 435 F. Supp. 2d 1261, 1274, 1289 (2006).  Additionally, the adverse use of facts

otherwise available can only be used fill gaps necessary to complete the factual record and ultimately to "find that the elements of the [CVD] statute have been satisfied," *Changzhou Trina Solar Energy Co. v. United States*, 43 CIT __, __, 359 F. Supp. 3d 1329, 1338 (2019). *See also Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) ("[I]t is clear that Commerce can only use facts otherwise available to fill a gap in the record.").

In its redetermination, Commerce again invoked the authority to use an adverse inference based on the finding that the GOC did not act to the best of its ability in responding to the Department's request for "the 2013 administrative rules, as well as other information concerning the operation of the EBCP." Remand Results at 13. Here, the Department's investigation relates to whether the EBCP provides a countervailable subsidy to Plaintiffs. Under the CVD statute, this requires a finding that a specific financial contribution occurred, and a benefit was therefore conferred. *See* 19 U.S.C. § 1677(5). The gap then, must relate to either element of this inquiry. Just because Commerce resorted to adverse facts available "does not obviate the need for Commerce to affirmatively find that the elements of the statute have been satisfied." *Changzhou Trina Solar Energy Co.*, 43 CIT __, __, 359 F. Supp. 3d at 1338. But as it currently stands, the Department has assumed the conclusion—that a gap in the record exists as a result of the GOC's failure to cooperate—without addressing what "constitutes a 'gap' in the record," *Zhejiang DunAn Hetian Metal*, 652 F.3d 1333, 1347, and by pointedly closing its eyes on the evidence provided by Guizhou that would "fairly detract[]" from its ultimate conclusion, *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). The law does not permit Commerce to circumvent the statutory requirements of the CVD statute just because a respondent fails to cooperate; nor is Commerce "relieve[d] [] from relying on *some* facts to make the requisite determinations to satisfy the elements of 19 U.S.C. § 1677(5)." *Changzhou Trina*

*Solar Energy Co.*, 43 CIT __, 359 F. Supp. 3d at 1340 (emphasis added).  Stripped away of its misconceptions surrounding the AFA statute, the Department is left with the most compelling facts placed on the record: that Plaintiffs *did not use* the Program, and therefore, no specific benefit was conferred.  Despite the court's instruction, there are still integral flaws in the Department's reasoning on remand. The court again concludes that Commerce erred in invoking its "adverse inference" authority with respect to the information (purportedly) missing from the record. Both the law and the record are clear, and there is more than enough reason to support the Plaintiffs' position.

For any use of AFA, "Commerce must still explain what information is missing and what adverse inferences reasonably lead[] to its conclusion."  *Changzhou III*, 2018 WL 6271653, at *3.  As before, the Department has failed to explain why information about the 2013 rule changes is relevant to verifying demonstrative claims of non-use; and, importantly, why the omission of this information constitutes a gap necessary to "complete the factual record," *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  The Department alleges that the GOC failed to cooperate to the best of its ability and therefore, the record lacks information concerning the use of the Program.  According to the Department, this permits Commerce to use adverse facts available to fill in this "missing" information.  But Commerce has the relationship backwards.  *See Guizhou III,* Slip Op. 19-114, 2019 WL 3948913, at *4 ("Commerce does not know what the 2013 rule change was, and consequently, the court finds no record support for the Department's determination that the rule change is tied to verification.").  There is evidence in the record that squarely detracts from Commerce's inference that Plaintiffs used and benefited from the EBCP.  Commerce may not simply declare that the evidence cannot be verified and therefore, a gap exists. That is not how it works.  Commerce must attempt verification *in order to*

*conclude* that a gap exists related to that inquiry; and then only after Commerce finds that the

"interested party has failed to cooperate by not acting to the best of its ability" can Commerce

use an adverse inference to fill that gap. 19 U.S.C. § 1677e(b)(1). The AFA statute empowers

Commerce to apply adverse inferences in those instances, but "it may not do so in disregard of

information of record that is not missing or otherwise deficient." *Zhejiang DunAn Hetian Metal*,

652 F.3d at 1348. Here, information related to the CVD inquiry is neither missing nor

demonstrably deficient, especially in light of the fact that the Department was once able to verify

declarations from U.S. customers indicating non-use of the EBCP. *See generally Changzhou I*,

41 CIT __, 255 F. Supp. 3d 1312.

The court recognizes the Department's quandary when it claims that verification might be

particularly onerous if EX-IM credits were disbursed through (unnamed) intermediary banks. As

Commerce explains, this is because there may "not necessary be an account in the name 'China

Ex-Im Bank' in the books and records . . . of the U.S. customer." Remand Results at 11. But

even with this supposed explanation (and indeed, the Department is only *assuming* verification

here would be onerous based on those circumstances), Commerce has not explained why it

cannot verify claims of non-use using a different method at its disposal. Just recently, the court

addressed these potential verification difficulties in *Changzhou IV*, Slip Op. 19-137, 2019 WL

5856438 and *Changzhou V*, Slip Op. 19-143, 2019 WL 6124909. There, as here, the Department

cited to records in earlier investigations, which gleaned at the various disbursement methods of

EBCP funds—including some that would make verification more or less difficult. *See*

*Changzhou IV*, 2019 WL 5856438 at *4; *Changzhou V*, 2019 WL 6124909 at *3. But as in

*Changzhou IV* and *Changzhou V*, it is also "not entirely clear" to this court that "the missing

information is required to effectively verify respondent's non-use of the program." *Id.*

Commerce has more verification tools at its disposal than the Government would have this court believe, including "spot checks and viewing underlying documentation," as suggested by Plaintiffs. *See* Pls.' Br. 4. The Department must use these tools to attempt to verify the non-use declarations *before* concluding that the evidence is unverifiable, and a gap exists in the record.

Finally, Commerce has an "obligation when drawing an adverse inference based on a lack of cooperation by a foreign government [] to avoid collaterally impacting respondents to the extent practicable by examining the record for replacement information." *Guizhou I*, 348 F. Supp. 3d at 1271. This sentiment rings especially true where the record's inadequacies may have even originated with Commerce. "Fairness requires that Commerce, before invoking an adverse inference, must have communicated its information requests clearly and adequately" to the respondents. *Peer Bearing Co.-Changshan v. United States*, 36 CIT 1115, 1130, 853 F. Supp. 2d 1365, 1377–78 (2012). After countless investigations of the EBCP (particularly those initiated after Commerce's knowledge of the 2013 revisions to the Program), Commerce should be able to seek information that would aid in its verification process, which includes asking "necessary questions to determine whether a review of EXIM Bank's user database could sufficiently demonstrate non-use," Pls.' Br. 5. Instead, Commerce has focused its inquiry on the operation of the program rather than Guizhou's alleged use of it. Commerce had an opportunity to "clearly and adequately" request additional information that would help the Department to verify the submitted non-use declarations (or ascertain Plaintiffs' alleged use of the Program); it failed to do so, and the court will not fault Plaintiffs for the Department's own shortcomings. Therefore, based on the record and the demonstrative evidence available, Commerce has failed to "compl[y] with the court's remand order," *SolarWorld Ams., Inc.*, 41 CIT at __, 229 F. Supp. 3d at 1365, as it relates to Commerce's application of the AFA statute to the EBCP.

## CONCLUSION

The court sustains the Department's additional explanation for its findings on market distortion in the Chinese synthetic rubber market. However, the Department has not complied with the court's previous remand order regarding the application of AFA to impute Plaintiffs' use of the EBCP. Therefore, on this round of remand and redetermination, Commerce is ordered to attempt verification using all reasonable tools at its disposal. And as in *Changzhou IV* and *Changzhou V*, in so doing, "Commerce should detail its process in its remand redetermination." 2019 WL 5856438, at *4; 2019 WL 6124908.

For the foregoing reasons, after careful review of all papers, it is hereby

**ORDERED** that Commerce's remand results as to Plaintiffs' use of the EBCP based on an alleged lack of cooperation and a gap in the record were unsupported by substantial evidence; and it is further

**ORDERED** that on remand, Commerce attempt verification of the submitted non-use declarations from Plaintiffs' U.S. customers, using all reasonable tools at its disposal, including methods suggested by Plaintiffs and by this court; it is further

**ORDERED** that Commerce detail its process in its remand redetermination as it relates to its verification of the non-use declarations; it is further

**ORDERED** that all other challenged determinations of Commerce are sustained; and it is further;

**ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff shall have thirty (30) days from the filing of the redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff's comments to file comments.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: December 10, 2019
New York, New York